# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MATTHEW SCIABACUCCHI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> LIBERTY BROADBAND CORPORATION, JOHN MALONE, GREGORY MAFFEI, MICHAEL HUSEBY, BALAN NAIR, ERIC ZINTERHOFER, CRAIG JACOBSON, THOMAS RUTLEDGE, DAVID MERRITT, LANCE CONN, and JOHN MARKLEY, <br><br> Defendants, <br><br> and <br><br> CHARTER COMMUNICATIONS, INC. <br><br> Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 11418-VCG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Date Submitted: February 21, 2017
Date Decided: May 31, 2017

Kurt M. Heyman and Melissa N. Donimirski, of HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; OF COUNSEL: Jason M. Leviton and Joel A. Fleming, of BLOCK & LEVITON LLP, Boston, Massachusetts, *Attorneys for Plaintiff*.

Martin S. Lessner, David C. McBride, James M. Yoch, Jr., and Paul J. Loughman, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: William Savitt and Anitha Reddy, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Defendants Michael Huseby, Balan*

*Nair, Eric Zinterhofer, Craig Jacobson, Thomas Rutledge, David Merritt, Lance Conn, John Markley, and Charter Communications, Inc*.

Donald J. Wolfe, Jr., Peter J. Walsh, Jr., Brian C. Ralston, Tyler J. Leavengood, Jaclyn C. Levy, and Aaron R. Sims, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Richard B. Harper, of BAKER BOTTS LLP, New York, New York, *Attorneys for Defendants Liberty Broadband Corporation, John Malone, and Gregory Maffei*.

GLASSCOCK, Vice Chancellor

This matter involves a complicated set of transactions, as the reader interested enough to persevere will discover. The questions it presents are not complex, however, at least at this stage of the pleadings. The directors of the Nominal Defendant, Charter Communications, Inc. ("Charter" or the "Company"), structured an acquisition of two other entities in the same industry, communications media, as Charter. Both acquisitions—the purchase of non-party Bright House Networks, LLC ("Bright House") and the merger with Time Warner Cable ("TWC")—were accomplished at the same time. Those transactions (the "Acquisitions") are not themselves the direct cause of the Plaintiff's Complaint; all parties agree that these transactions contributed value to Charter.

The Plaintiff is a Charter stockholder. His Complaint focuses on two related transactions: The Defendant directors of Charter issued equity to an insider, the largest stockholder of Charter, Defendant Liberty Broadband Corporation, purportedly to finance the Acquisitions in part. According to the Plaintiff, Liberty Broadband controlled Charter, and caused the Defendant directors and officers of Charter to structure the issuances of equity in a way favorable to Liberty Broadband and detrimental to Charter. The Complaint alleges that all these Defendants breached duties of loyalty, owed to Charter as well as to its stockholders directly, with respect to these transactions (the "Liberty Share Issuances" or "Issuances"). The Plaintiff contends that the Issuances were not necessary to the financing of the

1

Acquisitions.  The Plaintiff also alleges breaches of duty in connection with an additional transaction by which Liberty Broadband received a 6% voting proxy (the "Voting Proxy Agreement").  The Liberty Share Issuances and the Voting Proxy Agreement were approved in a single vote by the majority of the stock of Charter not controlled by or affiliated with Liberty Broadband, separate from the vote approving the merger with TWC.[1]

The matter is currently before me on Defendants' motions to dismiss.  As stated, the Plaintiff contends that Liberty Broadband controls Charter, and that, as a result, entire fairness review applies to his claims.  The Defendants argue strenuously that Liberty Broadband is not a controller.  I find—after review of the record, including a stockholders' agreement, referenced in the Complaint, that limits Liberty Broadband's ability to assert its will over Charter—that the Complaint fails to plead sufficient non-conclusory facts to make it reasonably conceivable that Liberty Broadband controls Charter.

Next, the Defendants argue that the Defendant directors were independent and disinterested, and that the Complaint fails to state a claim.  They also raise what I consider a predicate impediment to the Plaintiff, which the Defendants contend

---

[1] The Plaintiff also complains that, in the TWC merger, Liberty Broadband received more Charter stock (and less cash) in consideration for its TWC stock than did other TWC stockholders, presumably in a manner dilutive of the voting power of unaffiliated Charter stockholders.  This consideration differential was approved in the same vote as the Voting Proxy Agreement and the Liberty Share Issuances.

2

requires dismissal. The Defendants argue that the vote of the majority of unaffiliated stock in favor of the Liberty Share Issuances (and the Voting Proxy Agreement) cleanses any breaches of duty complained of, under the rationale of *Corwin v. KKR Financial Holdings LLC*.[2] Under *Corwin*, a fully informed, uncoerced vote of the majority of disinterested stock results in business judgment review attaching to the transaction so approved, leading to dismissal absent an adequate pleading of waste.[3] The rationale behind *Corwin* is hardly new; it amounts to a judicial recognition that the agency problems inherent in transactions made by directors involving the property of the stockholders are obviated by a vote of those stockholders in favor of the transaction, so that the will of the owners effectively supersedes that of the agents. In other words, there is little utility in a judicial examination of fiduciary actions ratified by stockholders. "For sound policy reasons, Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority that determines that a transaction with a party other than a controlling stockholder is in their best interest."[4]

I first turn, then, to the effect of the votes in favor of the Liberty Share Issuances. *Corwin* will not apply if the vote was coerced. If a controller stood on both sides of the transaction, the inherent coercion worked on the minority

---

[2] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).
[3] *See id.* at 308–309; *Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016).
[4] *Id.* at 306.

3

stockholders in the face of the intentions of the controller renders the vote insufficient to ratify the transaction.[5] I have already noted, for reasons I will explain below, that Liberty Broadband does not control Charter. Still, ratification will not cleanse a transaction where the vote is *structurally* coercive, as where the directors have created a situation where a vote may be said to be in avoidance of a detriment created by the structure of the transaction the fiduciaries have created, rather than a free choice to accept or reject the proposition voted on. In other words, a dismissal based on ratification represents a determination by the Court that the stockholders have found the challenged transaction to be in the corporate interest. If the vote was structured in such a way that the vote may reasonably be seen as driven by matters extraneous to the merits of the transaction, the Court cannot determine that the stockholders demonstrated thereby a determination that the challenged transaction was in the corporate interest. Such a vote is structurally coercive, and no cleansing by ratification obtains. The result is simply that a traditional analysis of the sufficiency of the complaint must follow.

Here, the Defendant directors were able to contract to acquire Bright House and TWC in a way that added value to Charter. They chose to finance those deals

---

[5] Business judgment in such a situation may nonetheless apply if a sufficient and independent special committee negotiates the deal with the controller, and the deal is conditioned from the outset on a positive vote of the majority of the unaffiliated shares. *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014).

4

partially with an issuance of additional equity to Charter's largest stockholder, Liberty Broadband. According to the Complaint, the Defendant directors were either self-interested or not independent of Liberty Broadband (and its principal, Defendant John Malone) in approving these financing transactions. The Liberty Share Issuances themselves, together with the Voting Proxy Agreement, according to the Complaint, were structured by the Defendants to transfer wealth and voting power from Charter and its unaffiliated stockholders to Liberty Broadband. The Defendant directors then submitted the Liberty Share Issuances and Voting Proxy Agreement for stockholder approval in a vote separate from the vote by which the TWC merger was effectuated. Nonetheless, the Defendant directors informed the stockholders that the lucrative acquisitions of Bright House and TWC were expressly conditioned on stockholder approval of the Liberty Share Issuances and Voting Proxy Agreement on the terms presented. In other words, to get the clear benefit of the acquisitions of Bright House and TWC, the stockholders had to swallow the pill of the Liberty Share Issuances and Voting Proxy Agreement.

Of course, there is nothing inherently nefarious in the latter: directors can act within their business judgment in the structuring of a transaction or the issuance of equity. But that is not the question here, in the first instance. The threshold question here is, *assuming* that wrongdoing by the Defendants inheres in the Liberty Share Issuances (and Voting Proxy Agreement), is it nonetheless cleansed by the ratifying

5

vote of the stockholders? In other words, did the stockholders, in a free and informed vote, approve the actions of the Defendants in the structure and consummation of the Issuances and Voting Proxy Agreement? Under the unique circumstances here, I find the answer is no.

I understand that some method of financing is inherent in every transaction, and typically an informed vote of the majority of the stock in favor of the transaction ratifies the directors' actions with respect to financing. Certainly, if a deal cannot proceed absent adoption of a particular financing, an informed vote for such a transaction is cleansing with respect to the financing method chosen. The Complaint here alleges that the directors separately, and for reasons unrelated to the business interest of Charter, chose to issue equity to an insider, then coerced acceptance of the inequitable issuance by tying it to approval of the underlying transaction. The Complaint alleges that Charter could "easily" have consummated the transactions without issuing equity to Liberty Broadband. Such a pleading, if merely conclusory, might be unpersuasive to implicate coercion. Here, however, the contents and omissions of the definitive proxy statement are telling. At least as far as the pleadings and current record disclose, the board did *not* determine that the Acquisitions could be consummated only via the Liberty Share Issuances and Voting Proxy Agreement. The directors did not seek or receive a fairness opinion that the Liberty Share Issuances, standing alone, were fair to the Company or the

6

stockholders. What the Complaint and proxy do disclose is that *Liberty Broadband* wished to make an additional equity investment in Charter, and communicated that to the Defendant directors, who then structured the Liberty Share Issuances. These are the facts from which I must infer whether the Liberty Share Issuances and the Voting Proxy Agreement are an integral part of the Acquisitions, or interested separate transactions for which the Defendant directors coerced stockholder approval.

Here, the Plaintiffs have pled facts making it reasonably conceivable that the vote was structurally coercive. Those facts, and the favorable inferences therefrom, indicate that the Defendant directors achieved value for the stockholders in the Acquisitions. They then conditioned receipt of those benefits on a vote in favor of transactions extraneous to the Acquisitions, the Liberty Share Issuances and the Voting Proxy Agreement. Assuming that viable breaches of fiduciary duty inhere in the Liberty Share Issuances (and the Voting Proxy Agreement), they cannot be cleansed by the vote, since that vote was not a free vote to accept or reject those transactions alone; it was a vote to preserve the benefit of the Acquisitions. In other words, ratification can cleanse defects inherent in a transaction, because the stockholders can simply reject the deal. Fiduciaries cannot interlard such a vote with extraneous acts of self-dealing, and thereby use a vote driven by the net benefit of the transactions to cleanse their breach of duty. Upon consideration, for reasons

7

detailed in this Memorandum Opinion, I find that the Plaintiff has adequately pled facts that raise a pleading-stage inference that the Liberty Share Issuances and the Voting Proxy Agreement are extraneous to the Acquisitions, and that a vote in favor of the Issuances and Voting Proxy Agreement was a condition of receiving the benefits of the Acquisitions.

"Coercion" is a loaded term, but a vote so structured by the Defendants, to accept one (allegedly self-interested) transaction so as not to lose the benefit of another independent transaction, cannot to my mind be considered uncoerced. Put another way, a vote so structured does not eliminate the agency problem by substituting the will of the stockholder/owners for that of the directors, because the directors have structured the vote in such a way that the vote must be in consideration of factors extraneous to the matter voted on. The stockholders did not decide, necessarily, that the Liberty Share Issuances and the Voting Proxy Agreement were "in their best interest," they only decided that the Acquisitions *and* the Issuances and Voting Proxy Agreement were, on net, beneficial. The facts are sufficient to an inference that the Liberty Share Issuances (and the Voting Proxy Agreement) were unnecessary to the Acquisitions. If so, and if such a vote were cleansing, then fiduciaries could attach self-dealing riders to any transaction under consideration, and avoid being held to account by a favorable stockholder vote. That is not equity; it would represent, not a cleanse, but a white-wash.

8

The result of this determination—that there is no controller but that *Corwin* does not apply due to structural coercion—simply means that the business judgment rule is not imposed via ratification under *Corwin*. Instead, I must consider whether the Complaint sufficiently states a claim. First, I must determine whether the claims alleged are derivative or direct. If the latter, they must withstand scrutiny under Rule 12(b)(6) to see if viable claims have been stated; if the former, the Complaint must make the more formidable demonstration required under Rule 23.1 as well. In that case, the Complaint must raise a reasonable doubt that the directors could exercise business judgment in evaluating a demand, making such a demand futile, before the Plaintiff may proceed on behalf of Charter.

Such an analysis is problematic based on the briefing. The Complaint, and the Plaintiff's briefing, assert in a conclusory way that this matter is both direct and derivative; the Defendants are equally cursory in briefing, alleging that, if the claims are derivative, demand has not been made and is not excused. Because *Corwin* is inapplicable here, the standard of review on these motions to dismiss will depend on the nature of the claims. I therefore reserve on the balance of the Motions to Dismiss so that the parties can address this issue with supplemental briefing. My reasoning follows.

## I. BACKGROUND[6]

### A. The Parties

Plaintiff Matthew Sciabacucchi was a stockholder of Charter at the time of the Acquisitions and maintains his ownership of Charter today.[7] The Plaintiff seeks to bring this action on behalf of himself and as a class action on behalf of Charter stockholders, as well as derivatively.[8] Defendant Liberty Broadband is incorporated in Delaware and maintains its headquarters in Colorado.[9] Liberty Broadband originally was a wholly-owned subsidiary of Liberty Media Corporation ("Liberty Media").[10] Liberty Media spun-off Liberty Broadband in 2014 so that now both Liberty Media and Liberty Broadband are separate, publicly traded companies (the "Liberty Broadband Spin").[11] Liberty Broadband owns approximately 26% of Charter stock, making it Charter's largest stockholder.[12]

Defendant John Malone has been on the Board of Charter since May 2013 as a Liberty Broadband designee.[13] Malone owns approximately 47% of the "aggregate voting power" in both Liberty Media and Liberty Broadband and is the chairman of

---

[6] The facts, drawn from Plaintiff's Verified Amended Class Action Complaint (the "Complaint") and from documents incorporated by reference therein, are presumed true for purposes of evaluating Defendants' Motions to Dismiss.
[7] Compl. ¶ 11.
[8] *Id.* at ¶ 1.
[9] *Id.* at ¶ 12.
[10] *Id.*
[11] *Id.*
[12] *Id.* at ¶ 2.
[13] *Id.* at ¶ 13.

the board of directors of both companies.[14] Malone also chairs the board of directors of Liberty Interactive Corporation and Liberty Global plc ("Liberty Global"), of which he owns 37% and 30%, respectively.[15] Malone is also a member of the board of directors of Discovery Communications, Inc. ("Discovery"), in which he holds a 28.9% voting interest for director elections.[16] Malone also previously served as chairman of the board of directors of the television network Starz, which was spun off from Liberty Media in 2013, and he still holds 46% of Starz voting power.[17] Malone is also a member of the board of directors of Lions Gate Entertainment Corporation ("Lionsgate") and owns 3.4% of Lionsgate stock.[18] Lionsgate "sold an additional 3.4% stake to Discovery and another 3.4% stake to Liberty Global" in November 2015.[19] Malone and Liberty Broadband are referred to collectively as the "Stockholder Defendants."

Defendant Gregory Maffei has served on Charter's Board since May 2013 as a Liberty Media designee.[20] Maffei is also the president and CEO of Liberty Media and Liberty Interactive.[21] Maffei holds a cornucopia of board memberships, and serves as the chairman of the boards of Live Nation Entertainment, Inc., Sirius XM

---

[14] *Id.* at ¶¶ 12–13.
[15] *Id.* at ¶ 13.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.* at ¶ 17.
[21] *Id.*

radio, Inc., Starz, and TripAdvisor, Inc.[22]  He is also a director of Zillow, Inc. and a former director at Barnes & Noble, Inc. ("Barnes & Noble") as Liberty Media's appointee.[23]

Defendant Michael Huseby has served on the Charter Board since May 2013 when Liberty Media appointed him to the position.[24]  Previously, Huseby was the CFO at AT&T Broadband from 1999 to 2002.[25]  He then served as Charter's CFO from 2002 to 2004 and subsequently as the CFO of Cablevision Systems Corporation ("Cablevision") from 2004 to 2011.[26]  When the Transactions were announced, Huseby "was the CEO and a director of Barnes & Noble, Inc., of which Liberty Media owned a 17% stake until 2014."[27]  Huseby now serves as the Executive Chairman of the board of Barnes & Noble Education, Inc., "which was spun off of Barnes & Noble."[28]

Defendant Craig Jacobson is an entertainment lawyer and has served on the Charter Board since July 2010.[29]  Jacobson also serves on the boards of Expedia, Inc. and Aver Media and previously was a director of Ticketmaster until it merged

---

[22] *Id.*
[23] *Id.* at ¶¶ 17, 49.
[24] *Id.* at ¶ 15.
[25] *Id.* at ¶ 51.
[26] *Id.* at ¶ 50.
[27] *Id.* at ¶ 15.
[28] *Id.*
[29] *Id.* at ¶¶ 16, 60.

12

with Live-Nation, Inc.[30]  Jacobson co-founded New Form Digital Studios, which is a joint venture with Discovery,[31] Brian Grazer, and Ron Howard.[32]

Defendant David Merritt has served on the Charter Board since December 2009.[33]  He is also Chairman of the Board's Audit Committee.[34]  Merritt previously worked at KPMG for twenty-five years, where he "served in a variety of capacities" such as "the national partner in charge of the media and entertainment practice."[35]  Merritt is the president of BC Partners, Inc., which, while he worked there, "engaged in a transaction with Liberty Global."[36]  Merritt also serves as a director of Buffet Restaurant Holdings, Inc., Calpine Corporation, and Taylor Morrison Home Corporation.[37]

Defendant Thomas Rutledge has been the CEO of Charter and served as one of its directors since February 2012.[38]  Rutledge previously worked as the COO of Cablevision and prior to that worked at American Television and Communications, a predecessor company to Time Warner Cable.[39]  He currently serves as a director

---

[30] *Id.* at ¶ 16.
[31] Malone possesses a 28.9% voting interest in Discovery and serves on its board of directors.  *Id.* at ¶ 59.
[32] *Id.*
[33] *Id.* at ¶ 19.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.* at ¶ 21.
[39] *Id.*

13

for CableLabs and C-SPAN.[40]  As of the time of the Complaint, Rutledge was expected to remain as CEO of New Charter—the newly formed parent company of Charter created as a result of the Acquisitions.[41]

Defendant Eric Zinterhofer has served on the Board of Charter since 2009 "and has been its non-executive chairman since December 1, 2009."[42]  Zinterhofer previously worked as a partner at Apollo Management L.P. and Morgan Stanley Dean Witter & Co.[43]  He is one of three founding partners of the private equity firm Searchlight Capital Partners, LLC.[44]  Zinterhofer is also a director of Leo Cable, LLC ("Leo Cable"), Dish TV India Ltd., Integra Telecom, Inc., and Hunter Boot, Ltd.[45]  Leo Cable is a joint venture between Searchlight and Liberty Global, each of which holds a 40% and 60% stake, respectively.[46]  In November 2012, Leo Cable purchased San Juan Cable LLC, d/b/a One Link Communications for approximately $585 million.  Two years later, in December 2014, Searchlight and Liberty Global "teamed up again to purchase the parent of Puerto Rico Cable Acquisition Company Inc., d/b/a Choice Cable TV" for $272 million.[47]  Choice Cable was then combined

---

[40] *Id.*
[41] *Id.*
[42] *Id.* at ¶ 22.
[43] *Id.*
[44] *Id.* at ¶¶ 22, 55.
[45] *Id.* at ¶ 22.
[46] *Id.* at ¶¶ 22, 55.  The Complaint refers to this Leo Cable joint venture as both a LLC and a LP. *See id.*  Because the structure of this entity does not affect my decision here, I assume both Leo Cable LLC and Leo Cable LP refer to the same entity.
[47] *Id.* at ¶ 56.

14

with Liberty Cablevision of Puerto Rico LLC to become the largest cable operator in Puerto Rico, 40% owned by Searchlight and 60% owned by Liberty Global.[48]

Defendant Balan Nair has served on the Board of the Company since May 2013 as a Liberty Media appointee.[49] Nair is an executive vice president and chief technology officer for Liberty Global.[50] He also serves as a director of Adran Corporation and Telenet Group Holdings, N.V., which is a subsidiary of Liberty Global.[51] Defendant John Markley, Jr. has served on the Charter Board since November 2009.[52] Markley is a managing director for Bear Creek Capital Management, a director of Broadsoft, Inc., Millennial Media, Inc., and "several private companies."[53] Defendant W. Lance Conn has served on the Board of Charter since 2009 and was an officer of Charter Investment, Inc.[54] Malone, Conn, Huseby, Jacobson, Maffei, Markley, Merritt, Nair, Rutledge and Zinterhofer are referred to collectively as the "Director Defendants."

Nominal Defendant Charter is a Delaware corporation headquartered in Stamford, Connecticut.[55] Charter is one of the largest cable providers in the United

---

[48] *Id.* at ¶¶ 55–56.
[49] *Id.* at ¶ 20.
[50] *Id.*
[51] *Id.*
[52] *Id.* at ¶ 18.
[53] *Id.*
[54] *Id.* at ¶ 14.
[55] *Id.* at ¶ 24.

States.[56] Charter's Board of Directors (the "Board") consists of ten members—the previously discussed Director Defendants.[57] Charter's amended and restated certificate of incorporation (the "Certificate of Incorporation") puts restrictions on "Business Combinations" between Charter and an "Interested Stockholder."[58] The Certificate of Incorporation defines an Interested Stockholder as "any person . . . who is, or has announced or publicly disclosed a plan or intention to become, the Beneficial Owner of Voting Stock representing ten percent (10%) or more of the votes entitled to be cast by the holders of all then outstanding shares of Voting Stock."[59] The Certificate of Incorporation defines a Business Combination as, among other things, "any merger or consolidation" with an Interested Stockholder; "any . . . transfer or other disposition or hypothecation of assets of the Corporation . . . to or for the benefit of" an Interested Stockholder; any "issuance by the Corporation . . . of securities to" an Interested Stockholder; and any "transaction . . . that . . . has the effect, directly or indirectly, of increasing the proportionate share of any class or series of capital stock . . . of the Corporation . . . Beneficially Owned by any Interested Stockholder."[60] Article Eighth prohibits Business Combinations

---

[56] *Id.*
[57] *Id.* at ¶¶ 13–22.
[58] *See* July 25, 2016 Transmittal Affidavit of James M. Yoch, Jr., Esquire ("Yoch Aff.") Ex. A at Ex. 3.1 ("Amended and Restated Certificate of Incorporation of Charter Communications, Inc." hereinafter the "Certificate of Incorporation"). I note that the papers reference these sources in the Yoch Aff. as "Yoch Decl."
[59] *Id.* at Art. 8(a), (b)(vi).
[60] *Id.* at Art. 8(a), (b)(i).

from proceeding unless two conditions are met: (1) "a majority of the Continuing Directors" determining, "after consultation with their outside legal and financial advisors," that the Business Combination "is fair to the Corporation and its stockholders;" and (2) "holders of not less than a majority of the votes entitled to be cast by the holders of all of the then outstanding shares of Voting Stock . . . voting together as a single class, excluding Voting Stock Beneficially Owned . . . by any Interested Stockholder or any Affiliate or Associate of such Interested Stockholder" approving the transaction.[61]

### B. Significant Non-parties

Non-party Advance/Newhouse Partnership ("Advance/Newhouse") is "a privately owned New York partnership headquartered in Syracuse, New York . . . controlled by two brothers, Donald Newhouse and Si Newhouse, Jr."[62] Advance/Newhouse controls 22% of the aggregate voting power of Discovery, which has three Advance/Newhouse designees on its board of directors.[63] Non-party Bright House was, before the transactions in this matter, a wholly owned subsidiary of Advance/Newhouse and was "the sixth-largest owner and operator of cable systems in the United States."[64] Non-party Goldman Sachs is an investment bank

---

[61] *Id.* at Art. 8(a). A "Continuing Director" with respect to an Interested Stockholder is "any member of the Board of Directors . . . who is not an Affiliate or Associate or representative of such Interested Stockholder." *Id.* at Art. 8(b)(v).
[62] Compl. ¶ 26.
[63] *Id.*
[64] *Id.* at ¶ 27.

that advised Charter in connection with the Acquisitions.[65]  A boutique investment bank, non-party LionTree, also advised Charter in connection with the Acquisitions.[66]

*C. Factual Overview*

      1. <u>The Original Liberty Transaction and Stockholders Agreement</u>

On May 1, 2013, Liberty Media purchased approximately 26.9 million shares of Charter with warrants to purchase 1.1 million additional shares for $2.6 billion (the "Original Liberty Transaction").[67]  As part of this transaction, Charter and Liberty Media entered into a stockholders agreement (the "Original Stockholders Agreement").[68]  As long as Liberty Media continued to own at least 20% of the outstanding Class A common stock of Charter, the Original Stockholders Agreement entitled Liberty Media to designate up to four persons "as nominees for election to the Board at least until January 2016" and provided that one of those designees would serve on each of the Board's Audit, Nominating and Corporate Governance, and Compensation and Benefits Committees.[69]  Charter was obligated to nominate Liberty Media designees to the Board, but could elect to terminate this obligation by

---

[65] *Id.* at ¶ 29.
[66] *Id.* at ¶ 30.
[67] *Id.* at ¶ 32.
[68] *Id.* at ¶ 34.  I have repeatedly noted that the inability of counsel to agree on shorthand terms for entities and transactions in briefing makes the Court's job more difficult.  Such inability was on display here.  Of course, coming up with better shorthand terms demonstrates creativity; I remind counsel that while creativity may serve virtue, it is not a virtue of itself.
[69] *Id.*

18

providing notice to Liberty Media starting in January 2016.[70] Upon the close of the Original Liberty Transaction, "Liberty Media submitted four designees who were immediately added to the Board: Malone, Maffei, Nair, and Huseby" (the "Liberty Media Designees," and subsequently the "Liberty Broadband Designees").[71]

The Original Stockholders Agreement restricted Liberty Media from acquiring "more than 35% of Charter's voting stock before January 2016 or more than 39.99% of Charter's voting stock thereafter."[72] Charter agreed to refrain from adopting any takeover device that would prohibit Liberty Media from accumulating up to 39.99% of Charter's outstanding stock.[73] Liberty Media also agreed to standstill provisions that "prohibited it from, among other things, engaging in any solicitation of proxies or consents."[74] However, if Charter elected to terminate its obligation to nominate Liberty Media's designees to the Board, these standstill provisions would also terminate.[75] Starting in 2017, Liberty Media and Charter each would hold "an annual right to terminate the Board nomination and standstill obligations by delivering notice to the other party of such termination in early January of such year."[76]

---

[70] *Id.* at ¶ 36.
[71] *Id.* at ¶ 33.
[72] *Id.* at ¶ 35.
[73] *Id.* at ¶ 34.
[74] *Id.* at ¶ 35.
[75] *Id.* at ¶ 36.
[76] *Id.*

19

The Original Stockholders Agreement was amended on September 29, 2014 in connection with the Liberty Broadband Spin. As part of the amendment, entered into between Liberty Media, Liberty Broadband, and Charter; Liberty Media assigned all of its rights under the Original Stockholders Agreement to Liberty Broadband (the "Amended Stockholders Agreement").[77] "Liberty Broadband assumed all such rights and agreed to perform all such obligations and Charter consented to the rights' assignment and assumption."[78] In other words, pursuant to the Amended Stockholders Agreement, Liberty *Broadband* could designate at most four of ten directors, could not acquire more than 35% of Charter stock, and could not solicit proxies.

2. SEC Filings

"As of June 10, 2015, Liberty Broadband owned approximately 25.74% of Charter's Class A common stock."[79] If Liberty Broadband's investment in Charter was "deemed to become passive," then it would be subject to regulation under the Investment Company Act of 1940 (the "1940 Act").[80] More specifically, to avoid the strictures of the 1940 Act arising from its investment in Charter, Liberty Broadband had to show "either directly or . . . through controlled companies," it was

---

[77] *Id.* at ¶ 37.
[78] *Id.*
[79] *Id.* at ¶ 38.
[80] *Id.* at ¶ 40.

20

"primarily engaged in business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities."[81]

Liberty Broadband naturally sought to avoid 1940 Act regulation, which, according to Liberty Broadband, could have resulted "in significant registration and compliance costs," required "changes to [its] corporate governance structure and financial reporting, . . . restrict[ed] [its] activities going forward," and "adversely impact[ed] [its] existing capital structure."[82]   On September 12, 2014, Liberty Broadband wrote a public letter to the SEC explaining that

> if (i) Charter is primarily controlled *by* Broadband; (ii) through Charter, Broadband engages in a business other than that of investing, reinvesting, owning, holding or trading in securities; (iii) Charter is not an investment company; and (iv) Broadband is not an investment company under Sections 3(a)(1)(A) or 3(a)(1)(B) of the Act, then Broadband should be entitled to rely on Rule 3a-1 as the basis for the conclusion that Broadband is not an investment company for purposes of the Act. [83]

The 1940 Act defines control as the "power to exercise a controlling influence over the management or policies of a company"[84] and provides a presumption that "[a]ny person who owns beneficially, either directly or through one or more controlled companies, more than 25[%] of the voting securities of a company shall be presumed

---

[81] *Id.* at ¶ 41 (citing 15 USCS § 80a-3(b)(2)).
[82] *Id.* at ¶ 40.
[83] *Id.* at ¶ 44 (emphasis added).
[84] *Id.* at ¶ 42 (citing 15 U.S.C. § 80a-2(a)(9)).

to control such company," although such a presumption is rebuttable.[85]

Accordingly, Liberty Broadband continued to write in the same September 12 letter:

> For the reasons discussed below, Liberty believes each of the foregoing criteria has been met. . . . Under Section 2(a)(9) of the Act, a person who owns beneficially, either directly or through one or more controlled companies, more than 25% of the voting securities of a company is presumed to control such company. *Thus, by virtue of the size of its ownership stake in Charter, Broadband will be presumed to control Charter.* Moreover, Broadband will "primarily" control Charter because it will be the largest single stockholder of Charter. . . . Second, through Charter, Broadband will engage in a business other than that of investing, reinvesting, owning, holding or trading in securities. *Broadband will devote substantial time and resources to overseeing Charter's communications businesses, and will actively participate in the governance of Charter*. Under Liberty's stockholders agreement with Charter . . . Liberty has the right to designate four persons for election to the Charter board of directors . . . . Pursuant to the stockholders agreement, Charter has agreed to cause one of Liberty's designees to serve on each of the nominating and corporate governance, audit and compensation and benefits committees of the board, provided such persons meet the applicable independence and other qualifications for membership on those committees. Currently, directors designated by Liberty serve on each of those committees.[86]

In light of certain pending transactions with Comcast (discussed below), Liberty Broadband also added that "[Liberty] Broadband believes that, based upon the facts and circumstances anticipated to exist following conclusion of the Comcast Transaction, *it would continue to maintain 'primary control' of Charter*."[87] Finally, in its most recent 10-K filed before the Complaint, Liberty Broadband wrote that:

---

[85] *Id.*

[86] *Id.* at ¶ 44 (emphasis in Complaint).

[87] *Id.* at ¶ 45 (emphasis in Complaint).

22

We do not believe we are currently subject to regulation under the Investment Company Act of 1940, *because our investment in Charter enables us to exercise significant influence over Charter. We have substantial involvement in the management and affairs of Charter, including through our board nominees. Liberty [Media] nominated four of Charter's ten current directors, and we have assumed Liberty [Media]'s nomination right under the terms of the [Original Stockholders Agreement].*[88]

### 3. The Comcast/TWC Transaction

Less than a month after the May 1, 2013 Original Liberty Transaction closed, Liberty Media "began pushing Charter towards a major strategic transaction."[89] Throughout late 2013 and into early 2014, Charter and Comcast discussed the possibility of a joint bid for TWC but these "negotiations broke down on February 4, 2014."[90] The next day, Malone called the lead TWC independent director and expressed an "interest in pursuing an alternative, more collaborative path toward combining TWC and Charter."[91] Assuming this call showed an attempt by Charter to acquire TWC by itself; such an attempt met almost immediate failure. Less than two weeks later, Comcast and TWC announced an agreement "for Comcast to acquire TWC in an all-stock transaction valued at approximately $45 billion" (the "Comcast/TWC Transaction").[92] Presciently anticipating a difficult path ahead with

---

[88] *Id.* at ¶ 39 (emphasis in Complaint).
[89] *Id.* at ¶ 63.
[90] *Id.* at ¶ 64.
[91] *Id.*
[92] *Id.* at ¶ 65.

regulators, Comcast and TWC planned to divest subscribers.[93] Accordingly, and contingent upon the completion of the Comcast/TWC Transaction, "Charter entered into a series of subscriber swaps with TWC and Comcast and a purchase agreement for the acquisition of a Comcast spun off subsidiary" (the "Comcast Divestment Transactions").[94]

### 4. The Original Bright House Transaction

Thwarted in its acquisition of TWC, Charter looked for other opportunities and found one in Bright House, owned by Advance/Newhouse.[95] In April 2014, Bright House sent Charter a list of "guiding principles" for any potential combination between the two companies.[96] Later in the month, the two companies entered into a non-disclosure agreement for exchanging confidential information to explore a potential combination.[97] Advance/Newhouse sent Charter a high-level term sheet on June 11, 2014 addressing their potential combination.[98] Advance/Newhouse proposed that it would "contribute Bright House to a partnership that would hold the combined company's operations" in exchange for, among other things, $1 billion in cash, convertible preferred units, common units

---

[93] *Id.*

[94] *Id.* at ¶ 66.

[95] *Id.* at ¶ 68.

[96] Yoch Aff. Ex. D (Charter Communications, Inc. Definitive Proxy Statement (Aug. 20 2015) hereinafter the "Proxy") at 137.

[97] *Id.*

[98] Compl. ¶ 91; Proxy at 137.

that would be exchangeable into Charter common stock, a number of board seats in proportion to its equity ownership, and consent rights over major corporate transactions.[99] Charter then returned to Advance/Newhouse a revised term sheet, in which it proposed limiting Advance/Newhouse's influence over Charter "particularly in conjunction with the existing share ownership and governance rights of Liberty Media" pursuant to the Original Stockholders Agreement.[100] The parties continued to negotiate and exchange drafts of term sheets throughout the summer and into the fall.[101]

By October, Advance/Newhouse and Charter, with the assistance of Charter's financial advisors Goldman Sachs and LionTree, had agreed to a non-binding term sheet laying out the "material terms of the potential combination," which they felt was advanced enough to share with Liberty Media.[102] On October 24, 2014, Liberty Media returned a mark-up of the term sheet to Charter reflecting various changes.[103] Liberty Media proposed that Advance/Newhouse "grant Liberty Media a proxy . . . to vote as many [Advance/Newhouse] shares in Charter as would be required to increase Liberty Media's total voting stake in Charter to 25.01%."[104] Liberty Media

---

[99] Proxy at 137.
[100] Compl. ¶ 91.
[101] *See* Proxy at 137–138.
[102] *Id.*
[103] *Id.* at 138.
[104] Compl. ¶ 93; Proxy at 138. As a reminder, 25% is the threshold requirement for Liberty Media, and, later, Liberty Broadband, presumptively to avoid regulation under the 1940 Act. *See* Compl. ¶ 42.

25

also proposed that "Charter grant Liberty Media preemptive rights to maintain its pro rata ownership stake in Charter . . . in connection with any issuance of equity securities of Charter."[105]

In late October 2014, Charter's Board of Directors met without the Liberty Media Designees.

> During the meeting, the directors . . . reviewed the potential conflicts of interest of Goldman Sachs and [Charter's legal advisor] Wachtell Lipton, as well as the potential conflicts of interest of all directors present at the meeting. The independent directors resolved to form a working group comprising Eric L. Zinterhofer, Chairman of Charter, John D. Markley Jr. and Lance Conn to meet as necessary to consider and negotiate the potential transaction. Because LionTree advised the Charter board of directors that they had a substantial historic and ongoing relationship with Liberty, the independent directors of the Charter board of directors negotiated and considered the transactions with Liberty without the participation of LionTree.[106]

Throughout the next several weeks, Liberty Broadband and Charter, without the presence of Advance/Newhouse, continued to negotiate the proposed governance and other terms of a potential combination with Bright House.[107] On November 11, 2014, during negotiations over Liberty Broadband's preemptive rights, "Liberty Broadband proposed to commit at the signing of the proposed combination to purchase not less than $650 million of Charter Class A common stock at closing at

---

[105] Proxy at 138–139.
[106] *Id.* at 139.
[107] *Id.* Liberty Broadband now held Liberty Media's shares of Charter because of the Liberty Broadband Spin. *Id.*

a price of $154.53 per share."[108]  Towards the end of November, Liberty Broadband and Charter "agreed to continue pursuing the potential combination with Bright House" based on a revised non-binding term sheet that "provided for pre-emptive rights enabling Liberty Broadband to maintain a 25.01% voting interest in Charter . . . and for a 13-member board with three Liberty Broadband designees and three [Advance/Newhouse] designees."[109]

The parties continued to negotiate and on March 5, 2015, Charter's Board met and discussed the value of the equity-linked consideration Charter would provide Advance/Newhouse as part of the potential combination.[110]  The Board discussed a proposal to use "the 60-day volume weighted average price of Charter Class A common stock" prior to signing and public announcement of the transaction and sent Bright House a revised term sheet reflecting this price on March 11, 2015.[111]  This term sheet also reflected that the reference price for Liberty Broadband's purchase of Charter common stock, now up from $650 to $700 million, would be based on the same 60-day weighted average price (the "Reference Price").[112]

On March 24, 2015, the Charter Board, without the Liberty Broadband Designees, met and agreed to continue to pursue the combination with Bright House

---

[108] *Id.*
[109] *Id.*
[110] *Id.* at 140.
[111] *Id.*
[112] *Id.* at 140–141.

"on substantially the terms proposed in the March 11, 2015 term sheet."[113] The full Board met on March 30, 2015.[114] "After a lengthy discussion of the benefits of the proposed transaction," the Liberty Broadband Designees voted in favor of the proposed transaction and then they, along with LionTree, left the meeting.[115] The rest of the Board then reviewed the negotiations with Liberty Broadband and Bright House. All of the directors present determined that the contemplated transactions and agreements with Liberty Broadband and Bright House were "fair to and in the best interests of Charter's stockholders" and accordingly approved them.[116]

Charter officially announced its acquisition of Bright House on March 31, 2015 (the "Original Bright House Transaction").[117] Charter agreed to pay Advance/Newhouse $2 billion in cash, and $5.9 billion of exchangeable common partnership units and $2.5 billion of convertible preferred partnership units, both of which were exchangeable into Charter common stock at the agreed-upon 60-day volume weighted average Reference Price, which was calculated to be $173 per share.[118] Pursuant to a new stockholders agreement between Charter, Liberty Broadband, and Advance/Newhouse that would become effective at closing, Advance/Newhouse would retain a 26.3% ownership stake in the resulting

---

[113] *Id.* at 141.
[114] *Id.*
[115] *Id.*
[116] *See id.*
[117] Compl. ¶ 69.
[118] *Id.*

company's outstanding common shares and Liberty Broadband would retain a 19.4% ownership stake.[119] Advance/Newhouse also agreed to grant Liberty Broadband a voting proxy on up to 6% of its shares, giving Liberty Broadband voting power of at least 25.01% at closing.[120] Both Advance/Newhouse and Liberty Broadband would also be granted preemptive rights allowing them to maintain their pro rata ownership.[121] Liberty Broadband agreed to purchase $700 million of newly issued Charter shares at the calculated Reference Price of $173 per share.[122] Finally, the resulting company's board would consist of thirteen members, with Advance/Newhouse and Liberty Broadband each designating three directors.[123]

The Original Bright House Transaction, however, "was contingent on the completion of the Comcast Divestment Transactions."[124] The regulatory difficulties faced by the Comcast/TWC Transaction proved insurmountable, and the Comcast/TWC Transaction was terminated on April 24, 2015.[125] Thus, the Comcast Divestment Transactions and the Original Bright House Transaction became void.[126]

---

[119] *Id.* at ¶ 70.

[120] *Id.* (citing press release).

[121] *Id.*

[122] *Id.* The Proxy notes that Rutledge and Miron, CEO of Bright House, agreed to disregard the effects of news reports about the potential combination on March 12, 2015 in calculating the Reference Price. Proxy at 141.

[123] Compl. ¶ 70.

[124] *Id.* at ¶ 69.

[125] *Id.* at ¶ 74.

[126] *See id.*

5. The TWC Merger and the New Bright House Transaction

On the same day as the Comcast/TWC Transaction's termination, Rutledge, Charter's CEO, spoke with Robert D. Marcus, previously the President and COO of TWC and currently its Chairman and CEO,[127] about a potential combination with TWC.[128] Rutledge also spoke with Maffei, CEO of Liberty Media, who expressed support for Charter pursuing a combination with TWC.[129] Maffei "noted Liberty Broadband's interest in making a significant additional investment in Charter, including by exchanging its TWC shares for Charter shares . . . in light of Charter's potential financing needs and Liberty Broadband's desire to maintain its percentage equity interest in Charter."[130] Charter also began exploring debt-financing sources for a potential combination with TWC.[131]

On May 4, 2015, Charter's Board met and "considered the ability of Charter to proceed with a TWC transaction either with or without consummation of the Bright House transaction or further equity investment by Liberty Broadband."[132] The Charter Board authorized Charter's management to make an offer for TWC for an implied nominal value of approximately $172.50 per TWC share based on

---

[127] Proxy at 136.
[128] *Id.* at 143.
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] *Id.* at 144.

Charter's stock price as of that day.[133]  The Charter Board also reaffirmed its willingness to "complete the Bright House transaction on substantially the same economic and governance terms as previously agreed."[134]

a. The Liberty Share Issuances and Liberty Stock Consideration

On May 16, 2015, Charter and Liberty Broadband management, including Maffei, discussed the "terms on which Liberty Broadband was interested in making an additional investment in Charter shares to partially finance the cash portion of the consideration to be paid to TWC stockholders and the terms on which Liberty Broadband would consider exchanging TWC shares for Charter shares."[135]  Liberty Broadband also indicated that Liberty Interactive "might be interested in exchanging its shares of TWC stock for shares of Charter stock on the same terms as Liberty Broadband instead of receiving cash and stock consideration."[136]  On May 17, 2015,

> the independent directors of Charter's board of directors met to receive an update from Mr. Zinterhofer and Wachtell Lipton regarding the Liberty Broadband investment, including the ongoing discussions regarding the aggregate amount of the investment and the per share price.[137]

Charter and Liberty Broadband eventually agreed that Liberty Broadband's additional investment of $4.3 billion would be "priced at a recent market price, on

---

[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] Compl. ¶ 108; Proxy at 147.
[137] Proxy at 147.

31

which the TWC transaction value was also based."[138]  Charter and Liberty Broadband also reached an agreement that Liberty Broadband's other purchase of newly issued common shares—the $700 million purchase initially agreed to in the Original Bright House Transaction—would remain priced at the Reference Price of $173 per share as previously agreed.[139]

b. The Charter Board Meets and Revises its Offer for TWC

On May 18, 2015, the Charter Board met and considered submitting a revised offer for TWC.[140]  After discussion, the Charter Board authorized Charter management to make a revised offer for TWC at an implied nominal value of $190 per share, which was "based on the then-prevailing 60-day volume-weighted average price of Charter Class A common stock."[141]  Negotiations continued, and on May 21, 2015 the Charter Board again authorized a revised offer for TWC, this time for an implied nominal value of $200 per share of TWC "based on the then-prevailing 60-day volume-weighted average price of Charter Class A common stock" or an implied nominal value of $195.71 per share of TWC "based on the closing price of Charter stock on May 20, 2015."[142]  Each TWC stockholder could elect to receive "either $100 or $115 in cash, and either 0.5409 Charter shares per

_____

[138] *Id.* at 149.
[139] *Id.*
[140] *Id.* at 147.
[141] *Id.* at 147–148.
[142] *Id.* at 149.

TWC share or 0.4562 Charter shares per TWC share, respectively."[143] Upon making this proposal, Marcus at TWC called Rutledge to inform him that TWC "was authorized to proceed" on the basis of this latest proposal.[144]

### c. The Charter Board Approves the TWC Merger, the New Bright House Transaction, and the Related Liberty Transactions

Charter's Board met for a final time on May 23, 2015 to consider the various transactions.[145] LionTree and Goldman each provided fairness opinions regarding the merger with TWC focusing on the consideration paid by Charter to TWC stockholders.[146] LionTree and Goldman also each provided a fairness opinion for the Bright House transaction.[147] LionTree did not offer any opinion on the transactions with Liberty,[148] while Goldman took the $700 million share issuance to Liberty "into account" in "calculating the fairness of the overall consideration paid for Bright House," but did not evaluate this issuance by itself.[149] The Liberty Broadband Designees voted unanimously in favor of the proposed transactions as fair and in the best interests of Charter's stockholders and then left the meeting along with LionTree.[150] The remaining directors then reviewed the negotiations over the

---

[143] *Id.*
[144] *Id.* at 150.
[145] *Id.* at 151.
[146] *See* Compl. ¶¶ 129–130.
[147] *Id.* at ¶¶ 126–127.
[148] *Id.* at ¶ 126.
[149] *See id.* at ¶ 127 n.8; Proxy at 196.
[150] Proxy at 152.

agreements with Liberty Broadband and Bright House.[151] "After further consideration and consultation with their advisors," the remaining directors unanimously determined that the merger agreement with TWC and the transactions and agreements with Liberty Broadband and Bright House were fair to and in the best interests of Charter's stockholders and approved them accordingly.[152]

On May 26, 2015, Charter announced that it had reached an agreement to merge with TWC (the "TWC Merger") for a mixed consideration of stock and cash.[153] The TWC Merger valued TWC at approximately $78.7 billion,[154] with Charter expecting to assume approximately $22.6 billion of TWC debt.[155] The mixed stock and cash consideration would amount to approximately $29.3 billion and $27.5 billion, respectively.[156] More specifically, Charter agreed to provide $100.00 in cash and shares equivalent to 0.5409 Charter shares for each outstanding TWC share in a newly created public parent company—New Charter.[157] Liberty Broadband and Liberty Interactive would receive all stock (the "Liberty Stock Consideration") for their TWC shares.[158] Charter also provided "an election option

---

[151] *Id.*
[152] *Id.*
[153] Compl ¶ 75.
[154] *Id.*
[155] Proxy at Cover Letter to Charter Stockholders.
[156] *Id.* I note that these numbers assume TWC stockholders selected the $100 cash option (discussed below) and exclude minor cash and/or stock consideration to former TWC employees and from replacement equity awards. *See id.*
[157] Compl. ¶ 75.
[158] *Id.*

for each [TWC] stockholder, other than [Liberty Broadband] or Liberty Interactive . . . to receive $115.00 of cash and [New Charter] shares equivalent to 0.4562 shares" of Charter for each TWC share.[159] Upon the closing of the TWC Merger, Liberty Broadband agreed to buy $4.3 billion of newly issued shares of New Charter at $176.95, which was the closing price of Charter as of May 20, 2015 (the "$4.3 Billion Share Issuance").[160]

At the same time that Charter announced the TWC Merger, it announced a new Bright House Transaction with similar terms as the Original Bright House Transaction (the "New Bright House Transaction").[161] Once again, pursuant to a new stockholders agreement between Charter, Liberty Broadband, and Advance/Newhouse, Advance/Newhouse agreed to grant Liberty Broadband a voting proxy on up to 6% of its shares (the "Voting Proxy Agreement").[162] Under this same stockholders agreement, Liberty Broadband again agreed to purchase $700 million of newly issued Charter shares at the previously agreed to $173 per share (the "$700 Million Share Issuance," and collectively with the $4.3 Billion Share Issuance, the "Liberty Share Issuances").[163] Liberty Broadband was also given the

---

[159] *Id.*

[160] *See id.* at ¶¶ 79, 81.

[161] *Id.* at ¶ 77.

[162] *Id.* at ¶ 83. There appears to be a discrepancy in the papers between whether the voting proxy was capped at 6% or 7%, for purposes of this Memorandum Opinion, I have adopted 6%, which is used more consistently in the briefing.

[163] *Id.* at ¶ 79.

ability to "purchase from any issuance of equity in conjunction with capital raising efforts sufficient shares to maintain its investment in the Company" and was carved out from any future stockholders rights plan that Charter may adopt.[164]  The TWC Merger and the New Bright House Transaction were conditioned on the Charter stockholders approving the Liberty Share Issuances and the Voting Proxy Agreement.[165]

### d. The Stockholder Vote

On August 20, 2015, Charter filed a definitive proxy statement with the SEC in connection with the TWC Merger and the agreements with Bright House and Advance/Newhouse (the "Proxy").  The Proxy explains the requirements of Article Eighth in Charter's Certificate of Incorporation, namely, that the transactions must be approved by a majority of unaffiliated outstanding shares of common stock entitled to vote.[166]  During a special meeting on September 21, 2015, 90% of outstanding Charter shares approved the TWC Merger.[167]  Excluding shares beneficially owned by Liberty Broadband and its affiliates, approximately 86% of outstanding Charter shares, in a single vote, voted in favor of the Liberty Share

---

[164] *Id.* at ¶ 84.
[165] *See id.* at ¶ 99.
[166] *See* Proxy at 121.
[167] Yoch Aff. Ex. F.

36

Issuances, the Liberty Stock Consideration, and the Voting Proxy Agreement.[168] The TWC Merger and the New Bright House Transaction closed on May 18, 2016.

*D. Before and After the Acquisitions*

To recapitulate, before the Acquisitions, Charter, TWC, and Bright House were separate entities. Bright House was wholly owned by Advance/Newhouse. Liberty Broadband owned 26% of Charter. After the Acquisitions, Charter[169] owned Bright House and had merged with TWC. Charter's ownership structure then consisted of the following: TWC shareholders owned between approximately 40% and 44%, Advance/Newhouse owned between approximately 13% and 14%, and Liberty Broadband owned between approximately 19% and 20%.[170] However, pursuant to the Voting Proxy Agreement, Liberty Broadband retained an additional voting interest of approximately 6%, keeping its total voting power about the same as it stood before the Acquisitions.

*E. Procedural History*

One day after Charter filed the Proxy, the Plaintiff filed his original complaint for breaches of fiduciary duties and alleged that the Proxy was materially incomplete by its failure to disclose certain unlevered free cash flow projections ("UFCF") and

---

[168] *Id.*

[169] Technically: New Charter.

[170] *See* Compl. ¶ 80. At least, as of the time of the press release cited by the Complaint, this was the expected resulting ownership structure.

the text of the Voting Proxy Agreement (the "Original Complaint").[171] The Plaintiff filed a Motion to Expedite and moved for a preliminary injunction seeking to enjoin the Acquisitions. Charter supplemented the Proxy on September 9, 2015, providing the UFCF projections and the text of the Voting Proxy Agreement. The Plaintiff then withdrew his Motion to Expedite and Motion for a Preliminary Injunction, writing to the Court, "the parties have not agreed to any type of settlement or release of any claims" but that "the additional disclosures did moot Plaintiff's pending motions."[172]

After closing, the Plaintiff filed his Verified Amended Class Action Complaint (the "Complaint") on April 22, 2016 pleading four counts. Count I is an individual and class claim for breach of fiduciary duty against the Director Defendants. The Plaintiff alleges that the Director Defendants violated their duties of care and loyalty by agreeing to the Liberty Share Issuances and the Voting Proxy Agreement and failing to disclose all "material facts necessary for shareholders to cast an informed vote on, amongst other things, whether to enter into the Transactions and issue the shares contemplated thereunder."[173] According to the Plaintiff, the Liberty Share Issuances and the Voting Proxy Agreement "will unfairly expropriate and transfer voting and economic power from Charter's public

---

[171] Original Complaint ¶¶ 137–138 (Dkt. No. 1).
[172] Pl's Letter to the Court at 2 (Sept. 10, 2015) (Dkt. No. 12).
[173] Compl. ¶¶ 157–159.

shareholders to" Malone and Liberty Broadband—the Stockholder Defendants.[174] Count II is an individual and class claim for breach of fiduciary duty against the Stockholder Defendants. The Plaintiff alleges that the Stockholder Defendants are *de facto* controlling shareholders of Charter and thus owe the Plaintiff and the Class fiduciary duties. According to the Plaintiff, the Stockholder Defendants violated their fiduciary duties by "causing the Board to agree to the Liberty Share Issuances and [the] Voting Proxy [Agreement]."[175] Counts III and IV plead derivative claims on behalf of Charter for breach of fiduciary duty against the Director Defendants and the Stockholder Defendants for the same actions as Counts I and II—agreeing to, or causing the Board to agree to, the Liberty Share Issuances and the Voting Proxy Agreement.[176]

The Defendants moved to dismiss the Complaint on July 22, 2016 under Court of Chancery Rule 12(b)(6) for failure to state a claim and Rule 23.1 for failing to make a demand on the Board, which the Defendants argue should not be excused here. I heard oral argument on Defendants' Motions to Dismiss on November 15, 2016. In February 2017, the parties submitted supplemental letters in light of recent decisions of this Court. My Memorandum Opinion on the Motions to Dismiss follows.

---

[174] *Id.* at ¶ 159.
[175] *Id.* at ¶¶ 161–163.
[176] *Id.* at ¶¶ 165–171.

## II. ANALYSIS

The Complaint alleges claims on behalf of the Plaintiff, and derivatively on behalf of Charter. The Defendants have moved to dismiss the Complaint pursuant to Court of Chancery Rules 23.1 and 12(b)(6) for failure to state a claim. As is well-settled, when examining a motion for failure to state a claim under Rule 12(b)(6),

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[177]

However, the Court should accept "[o]nly true reasonable inferences,"[178] rather than "every strained interpretation of the allegations proposed by the plaintiff."[179] Rule 23.1 vindicates director control of claims belonging to the corporation; where, as here, no demand on the board is made, the Complaint must plead facts indicating that the directors could not bring business judgment to bear on such a demand.[180] I first examine the Motions under Rule 12(b)(6).

The Plaintiff attempts to rebut the presumption under the business judgment rule "that in making a business decision, the board of directors acted on an informed basis, in good faith and in the honest belief that the action was taken in the best

---

[177] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal quotations omitted).

[178] *Pfeffer v. Redstone*, 965 A.2d 676, 683 (Del. 2009).

[179] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[180] *See Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chic. v. Smith*, 2017 WL 1382597, at *4–5 (Del. Ch. Apr. 18, 2017).

interests of the company."[181] To do so, the Plaintiff argues that the Stockholder Defendants controlled Charter.[182] The Defendants counter that the Stockholder Defendants were minority owners of Charter, and that the facts pled demonstrate that those Defendants did not possess actual control of Charter, particularly in light of the Amended Stockholders Agreement.[183] Moreover, even if the Stockholder Defendants controlled Charter, the Defendants argue that *Kahn v. M & F Worldwide Corporation*[184] ("*MFW*") applies and cleanses the transaction.[185] I do not need to reach this latter issue, however. After reviewing the Complaint, and for the reasons that follow, I find that the Plaintiff has failed to plead sufficient facts making it reasonably conceivable that the Stockholder Defendants controlled Charter.

The Plaintiff also argues that the directors acted disloyally in entering into the Liberty Share Issuances and Voting Proxy Agreement. The Defendants dispute this claim, but argue that, regardless, any inequities in these transactions have been cleansed by the ratifying vote of a majority of disinterested Charter stockholders pursuant to the *Corwin* doctrine.[186] Because I find it reasonably conceivable that,

---

[181] *Solomon v. Armstrong*, 747 A.2d 1098, 1111 (Del. Ch. 1999) (internal quotations omitted).
[182] Pl's Answering Br. 2.
[183] Charter Defs' Opening Br. 24–25; Liberty Defs' Opening Br. 16.
[184] 88 A.3d 635 (Del. 2014).
[185] Charter Defs' Opening Br. 42–43. *See MFW*, 88 A.3d at 644 (holding that "business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders").
[186] Charter Defs' Opening Br. 38–39.

despite the absence of a controller, the vote of the stockholders here was structurally coerced, ratification under *Corwin* is unavailable to the Defendants. Accordingly, the business judgment rule is not imposed via ratification under *Corwin*, and I must proceed to examine whether the Complaint withstands scrutiny under Rule 12(b)(6).

*A. The Stockholder Vote Failed to Cleanse the Transaction*

Under *Corwin*, business judgment review applies in an action challenging a transaction that has been approved by a fully informed, uncoerced vote of the disinterested stockholders.[187] This is the case even if the transaction might otherwise have been subject to entire fairness due to conflicts faced by individual directors.[188] The result, absent an adequate pleading of waste, is dismissal.[189] The rationale of this line of cases is simple—where holders of a majority of stock vote to evince their determination that the transaction is in corporate best interest, there is little utility in a judicial second-guessing of that determination by the owners of the entity. The doctrine depends on the Court's ability to find that the stockholder vote represented an informed determination that the challenged transaction was in the corporate interest.

In that light, there are two limitations on the application of *Corwin*: the vote must be fully informed, and be uncoerced. Both limitations aim at the same problem.

---

[187] *Corwin*, 125 A.3d at 309.
[188] *Larkin v. Shah*, 2016 WL 4485447, at *1 (Del. Ch. Aug. 25, 2016).
[189] *See Singh*, 137 A.3d at 151–152.

42

The Court cannot assume from an *uninformed* vote that stockholders determined that the transaction was beneficial, in light of the actual facts; thus, an uniformed vote has no ratification effect. Likewise, a *coerced* vote offers no assurance that the stockholders have made a determination that *the transaction at issue* is beneficial, only that, under whatever coercive factors exist, they are better accepting the transaction than the alternative. That is what "coercion" means in this context; that facts extraneous to the challenged transaction may have driven the vote, and not a determination by the stockholders that the transaction was in the corporate interest.

Thus, controller transactions are inherently coercive, and a transaction with a controller cannot be ratified by a vote of the unaffiliated majority; the concern is that fear of controller retribution in the face of a thwarted transaction may overbear a determination of best corporate interest by the unaffiliated majority. In such a case, the Court cannot determine that a vote ratifies the transaction on its own merits. Likewise, ratification does not follow from a vote that is structurally coercive. Note that this "coercion" need not imply any wrongdoing on the fiduciaries in the way they have structured the vote;[190] it simply means that the Court cannot assume that the vote of the stockholders with respect to the challenged transaction was an informed ratification of that transaction, because of the way the question upon which

---

[190] *See In re Saba Software, Inc. Stockholder Litig.*, 2017 WL 1201108, at *15 (Del. Ch. Mar. 31, 2017) (explaining that coercion does not turn on the intent of the fiduciaries, but on the effect on stockholder voting).

43

they voted is constructed. For instance, a single vote to approve several unrelated matters, in theory, could be coercive in this sense, if the Court could not conclude that the vote represented an informed ratification of the challenged transaction on its merits. That is all that I mean by "coercion" in this context.[191]

Here, a majority of the unaffiliated stock was voted, in a single vote, in favor of the Issuances and the Voting Proxy Agreement. I must apply the analysis above to determine whether this vote was an informed,[192] uncoerced, ratification of those transactions. I first find that these transactions did not involve a controller, and thus that inherent coercion was not in play. I then turn to structural coercion. The Director Defendants structured the vote on the Liberty Share Issuances and Voting Proxy Agreement such that failure to approve those transactions would cause the stockholders to lose the benefits of separate transactions, the Acquisitions. Because I find, based on the applicable pleading-stage record and inferences, that the Issuances and Voting Proxy Agreement were extraneous to the Acquisitions, but receipt of the benefits of the Acquisitions was expressly conditioned on a positive vote on the Issuances and Voting Proxy Agreement, no ratification occurred. I cannot determine that the vote in favor of the Issuances and Voting Proxy Agreement

---

[191] Coercion in this sense, "imposing an extrinsic incentive on the stockholder vote unrelated to the transaction challenged," is, no doubt, a peculiar use of the term, "coercion." In true Dumptian fashion, to "coerce" is used in different ways in our law, depending on the interests in consideration and the result of a finding of coercion.

[192] Because of my decision on coercion, I need not reach the Plaintiff's argument that disclosure deficiencies rendered the vote uninformed.

represented a determination by stockholders that those transactions were themselves in the corporate interest.

## 1. The Stockholder Defendants are not Controlling Stockholders

As is well-established, a plaintiff can shift the standard of review from the business judgment rule to entire fairness by either establishing the presence of a controlling stockholder on both sides of a transaction or showing that "at least half of the directors who approved the transaction were not disinterested or independent."[193] An owner of a majority of stock, obviously, may control the board. Here, however, the Stockholder Defendants controlled a minority block—about a quarter—of the voting stock of Charter.

A stockholder who owns less than 50% of the voting power of a corporation may still qualify as a controller—and owe the accompanying fiduciary duties—if he "exercises control over the business affairs of the corporation."[194] To invoke entire fairness, the Complaint must contain well-pled facts "demonstrating [the stockholder's] actual control with regard to the particular transaction that is being challenged."[195] This actual control test is "not an easy one to satisfy" as "stockholders with very potent clout have been deemed, in thoughtful decisions, to

---

[193] *In re KKR Financial Holdings LLC Shareholder Litigation*, 101 A.3d 980, 990 (Del. Ch. 2014).
[194] *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994) (internal quotations omitted).
[195] *In re KKR*, 101 A.3d at 991 (citations omitted); *see In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) ("Allegations of control over the particular transaction at issue are enough.").

fall short of the mark."[196] Moreover, in order to establish actual control by stockholders, and thus impose fiduciary duties on them, they must "have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control."[197]

Otherwise, stockholders are not fiduciaries for the entities in which they own stock. They are free to own, sell and vote their stock in their own self-interest. Such independence is fundamental to the separation of ownership and control that makes the corporate form a viable way to organize a business entity. Corporate fiduciaries, on the other hand, are prohibited from considering their self-interest in making corporate decisions. They must exercise their business judgment on behalf of the entity and its stockholders, free from the taint of personal interest. Thus, it is only where a stockholder assumes actual control over the decision-making process of the entity, as where the stockholder has a majority interest and thus controls the board of directors, or is otherwise able to overbear the business judgment of the directors, that the law holds her to fiduciary standards. Again, a finding that a stockholder is a controller has dramatic consequences—she is no longer able to act in self-interest, but must act in the corporate interest only, and entire fairness applies to transactions with the controller. The requirements for a sufficient pleading of controller status

---

[196] *See In re PNB Holding Co. Shareholders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).
[197] *Id.*

46

are appropriately rigorous, therefore; the complaint must plead facts that, if true, imply actual control over the board of directors by the stockholder.

The Plaintiff argues the Stockholder Defendants controlled Charter due Liberty Broadband's 26% equity stake, its letters to the SEC allegedly admitting control, and the Stockholder Defendants' influence on the Charter Board.[198]  At first glance, it would appear reasonably conceivable that the Stockholder Defendants exercised actual control here.  Upon further examination, however, and pursuant to the stringent standard for control just described, I find that the contractual restrictions levied on the Stockholder Defendants by the Amended Stockholders Agreement and Charter's Certificate of Incorporation are sufficient to overcome any inference that Liberty Broadband was able to exercise actual control over Charter in relation to the Liberty Share Issuances and Voting Proxy Agreement.

a. The Amended Stockholders Agreement

Pursuant to the Amended Stockholders Agreement, Liberty Broadband could not acquire more than 35% of Charter stock,[199] designate more than four out of ten directors, or solicit proxies or consents.[200]  Additionally, for a broad range of transactions, Charter's Certificate of Incorporation requires, perhaps in an attempt

---

[198] *See* Pl's Answering Br. 2–3.
[199] I note that this amount was set to increase to 39.99% after January 2016.  *See* Compl. ¶ 35.
[200] *See id.* at ¶¶ 33–35, 37.

to invoke *MFW*,[201] approval by certain directors and a majority of unaffiliated stockholders. These contractual restrictions inform my control analysis, and ultimately play the primarily role in prohibiting a pleading stage inference of control here.

> b. The Stockholder Defendants Do Not Have a Controlling Influence on the Board of Directors

The Plaintiff contends that the Stockholder Defendants controlled a majority of the Board,[202] or at least enough directors to veto any transaction, which, according to the Plaintiff, is sufficient to establish control.[203] The Complaint, however, does not evince actual control over a majority of directors; the pleadings are limited to showing that the directors share interests with the Stockholder Defendants, not that the directors are subject to actual control. Similarly, in briefing the Plaintiff argues that I should infer that the Stockholder Defendants—who hold a minority of the voting power—are controllers, because, he alleges, a majority of the Board lacks independence from the Stockholder Defendants.[204] In other words, the Plaintiff appears to be conflating a pleading that a majority of the Board lacked independence from an interested party, with a pleading of actual control by that interested party. However, it does not necessarily follow that an interested party also *controls*

---

[201] 88 A.3d 635 (Del. 2014).
[202] Pl's Answering Br. 21.
[203] *Id.*
[204] *See id.* at 21–39.

48

directors, simply because they lack independence. Lack of independence focuses on the director, and whether she has a conflict in the exercise of her duty on behalf of her corporation. Consideration of controller status focuses on the alleged controller, and whether it effectively controls the board of directors so that it also controls disposition of the interests of the unaffiliated stockholders: If yes, it is a fiduciary, if no, it is simply a stockholder free to act in its own interests. A sufficient allegation of control by a minority owner over the directors may imply controller status, but the analysis must still turn on the power of the alleged controller to co-opt the board.[205]

According to the Plaintiff, the Stockholder Defendants controlled Charter because they allege a majority of the Charter Board was beholden to the Stockholder Defendants due to, as laid out in painful detail in the Facts section of this Memorandum Opinion, their influence over the directors' employment or investments.[206] The Defendants do not contest the independence or disinterestedness of Malone and Maffei.[207] The Plaintiffs, on the other hand, do not challenge the

---

[205] *See Calesa Associates, L.P. v. American Capital, Ltd.*, 2016 WL 770251, at *10–11 (Del. Ch. Feb. 29, 2016) (finding control of the board reasonably conceivable but explaining that one director was a dual fiduciary and disclosures related to certain other directors stated their divergent interests from that of the company's stockholders and their affiliation with the alleged controller); *New Jersey Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *8–11 (Del. Ch. Sept. 30, 2011) (finding it reasonably conceivable that one director controlled the board of directors "through a pattern of threats" that could have intimidated them).
[206] Pl's Answering Br. 3.
[207] Charter Opening Br. 31.

independence of Conn, Markley, and Merritt. Therefore, the independence of five, out of ten, directors remains in dispute: Nair, Huseby, Zinterhofer, Jacobson, and Rutledge. For Nair, Huseby, Zinterhofer, and Jacobson, Plaintiff's allegations of these directors lacking independence from the Stockholder Defendants revolve around various alleged business connections and professional histories between each director and Malone. The Plaintiff also adds that Nair and Huseby are Liberty Broadband designees, which they admit is not dispositive. For Rutledge, the CEO of Charter, the Plaintiff argues, "senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller;"[208] obviously, this is unhelpful in establishing that Liberty Broadband and its associates *are* controllers.

In other words, the Complaint alleges that some Director Defendants share interests with the Stockholder Defendants. Whether or not this is a sufficient pleading to imply lack of director independence, it is not sufficient, if true, to show that Liberty Broadband and its associates exercised actual control over the Board.

The Plaintiff cites to *In re Cysive, Inc., Shareholder Litigation*[209] and *In re Zhongpin Inc. Stockholders Litigation*[210] for the proposition that "a stockholder who

---

[208] Pl's Answering Br. 34 (citing *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 25, 2016)).
[209] 836 A.2d 531 (Del. Ch. 2003).
[210] 2014 WL 6735457, at *8 (Del. Ch. Nov. 26, 2014).

50

controls neither a majority of the stock nor a majority of the board can still be controlling, given the inherent coercive power attendant to a large block holder who controls a significant number of directors."[211]  Additionally, the Plaintiff references *Cysive* for the notion that contractual restrictions in stockholders agreements "preventing a stockholder from directly designating a majority of the board" are insufficient to prevent a finding of control.[212]

*Cysive*, I note, has been labeled by its author—Chief Justice Strine—as the "most aggressive finding that a minority block holder was a controlling stockholder."[213]  In that case, then-Vice Chancellor Strine found that a 40% stockholder (approximately 35% when excluding beneficially owned options), who was the company's founder, chairman, and CEO; whose family members held two executive positions;  and who, together with his subordinate and family members, formed a unified voting coalition, was a controller.[214]  Then-Vice Chancellor Strine focused on the alleged controller's  "managerial control" and "voting power" which "position[ed] him well to elect a new slate more to his liking without having to attract much, if any, support from public stockholders."[215]  Also of note, the alleged controller in *Cysive* was "involved in all aspects of the company's business, was the

---

[211] Pl's Answering Br. 22.
[212] *Id.* (citing *Cysive*, 836 A.2d at 551).
[213] *In re Morton's Rest. Grp., Inc. Shareholders Litig.*, 74 A.3d 656, 664–66 (Del. Ch. 2013).
[214] *Cysive*, 836 A.2d at 551–553.
[215] *Id.* at 552.

51

company's creator, and ha[d] been its inspirational force."[216] Similarly, the Court in *Zhongpin* found it reasonably conceivable that the founder, chairman, and CEO who beneficially owned 17.3% of the company was a controller because he "could exercise significant influence over shareholder approvals for the election of directors, mergers and acquisitions," and bylaw amendments and "possessed active control over" day-to-day operations.[217]

Here, however, the alleged influence of the Stockholder Defendants over the Charter Board, while relevant to the issue of whether a majority of the board is disinterested or lacks independence, does not rise to the level of actual control similar to that found in *Cysive* or *Zhongpin*. As discussed, the particularities of the Amended Stockholders Agreement here prevented Liberty Broadband from designating a majority of Board seats and from soliciting proxies, distinguishing its position from the stockholder in *Cysive* who was well-positioned "to elect a new slate more to his liking."[218] The Amended Stockholders Agreement also limited Liberty Broadband from potentially accumulating more than 35% of the stockholder vote, which would be below the percentage *actually*, rather than just *potentially*, beneficially owned by the alleged controller in *Cysive*. Finally, Charter's Certificate of Incorporation required approval of transactions such as those at issue by certain

---

[216] *Id.*
[217] *In re Zhongpin*, 2014 WL 6735457, at *7–8.
[218] *Cysive*, 836 A.2d at 552.

directors and unaffiliated stockholders. A bevy of contractual restrictions constrained Liberty Broadband from control of Charter; no such restrictions were present in *Cysive*, or *Zhongpin*, and I therefore find those cases inapposite to this matter.

### c. SEC Filings

Of most concern to me here is Liberty Broadband's letters to the SEC, which I have reproduced again in full below.[219]

> For the reasons discussed below, Liberty believes each of the foregoing criteria has been met. . . . Under Section 2(a)(9) of the Act, a person who owns beneficially, either directly or through one or more controlled companies, more than 25% of the voting securities of a company is presumed to control such company. *Thus, by virtue of the size of its ownership stake in Charter, Broadband will be presumed to control Charter.* Moreover, Broadband will "primarily" control Charter because it will be the largest single stockholder of Charter. . . . Second, through Charter, Broadband will engage in a business other than that of investing, reinvesting, owning, holding or trading in securities. *Broadband will devote substantial time and resources to overseeing Charter's communications businesses, and will actively participate in the governance of Charter*. Under Liberty's stockholders agreement with Charter . . . Liberty has the right to designate four persons for election to the Charter board of directors . . . . Pursuant to the stockholders agreement, Charter has agreed to cause one of Liberty's designees to serve on each of the nominating and corporate governance, audit and compensation and benefits committees of the board, provided such persons meet the applicable independence and other qualifications for membership on those committees. Currently, directors designated by Liberty serve on each of those committees.[220]

---

[219] I refer the interested reader to the Facts section for better context. *See supra* notes 79–88 and accompanying text.

[220] Compl. ¶ 44 (emphasis in Complaint).

[Liberty] Broadband believes that, based upon the facts and circumstances anticipated to exist following conclusion of the Comcast Transaction, *it would continue to maintain 'primary control' of Charter.*[221]

[Liberty Broadband] do[es] not believe we are currently subject to regulation under the Investment Company Act of 1940, *because our investment in Charter enables us to exercise significant influence over Charter. We have substantial involvement in the management and affairs of Charter, including through our board nominees. Liberty [Media] nominated four of Charter's ten current directors, and we have assumed Liberty [Media]'s nomination right under the terms of the [Original Stockholders Agreement].*[222]

The Plaintiff again cites to *Zhongpin*, this time for the notion that the Court found a 17% stockholder to be a controller where the company's 10-K stated the stockholder had significant influence over management and described the stockholder as a controlling stockholder.[223]  Similarly, the Plaintiff references *In re Loral Space & Communications, Inc.*[224] for the proposition that stockholders have been found to be controlling where the stockholder and company publicly maintained outside the litigation that the stockholder controlled the company.[225]  This case is distinguishable, however; in *In re Loral*, the controlling stockholder also seated a majority of directors of the company.[226]  Also, as previously discussed, the controller in *Zhongpin* had significant influence over elections and active control of day-to-day

---

[221] *Id.* at ¶ 45 (emphasis in Complaint).
[222] *Id.* at ¶ 39 (emphasis in Complaint).
[223] Pl's Answering Br. 19.
[224] 2008 WL 4293781 (Del. Ch. Sept. 19, 2008).
[225] *Id.* (citing *In re Loral*, 2008 WL 4293781, at *21).
[226] *In re Loral*, 2008 WL 4293781, at *21.

operations.[227] In other words, the public declarations of control in both these cases were not the only considerations by which the Court determined those defendants exercised control.

I find, despite these initially-persuasive statements to the SEC, and in light of my discussion above regarding Plaintiff's other allegations of control, the contractual handcuffs binding the Defendants here prevent me from finding it reasonably conceivable that the Stockholder Defendants were capable of exercising actual control over Charter. Without the contractual restrictions of the Amended Stockholders Agreement and the Certificate of Incorporation, it seems to me that Liberty Broadband's statements to the SEC would likely be sufficient to establish, at the pleading stage, that the Stockholder Defendants were controllers. In other words, absent contractual restrictions as exist here, it would seem to me reasonably conceivable that a company that tells the SEC it exercises "primary control" and has a "significant influence" over another company is a controller of that company, regardless of the fact that the statements were made in a different context in which they were self-serving. Here, however, as is common throughout the entire analysis of control in this matter, the restrictions in the Certificate of Incorporation and the Amended Stockholders Agreement prevent such a finding. Despite the SEC

---

[227] *In re Zhongpin Inc.*, 2014 WL 6735457, at *7–8.

55

disclosures, in other words, the Stockholder Defendants were not in a position to exercise actual control over the directors.

In light of the foregoing, I do not find it reasonably conceivable, upon the facts pled, that the Stockholder Defendants were controlling fiduciaries of Charter with respect to the transactions at issue. Accordingly, I need not conduct a *MFW* analysis and, for purposes of *Corwin*, no coercion exists from the presence of a controller. As discussed below, however, the vote here was structured in such a way to make it reasonably conceivable that the stockholder vote was coerced.

## 2. The Stockholder Vote was Structurally Coerced

*Corwin* and its progeny exist primarily to "avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and informed chance to decide on the economic merits of a transaction for themselves."[228] Our Supreme Court has explained further that

> [w]hen the real parties in interest—the disinterested equity owners—*can easily protect themselves at the ballot box by simply voting no*, the utility of a litigation-intrusive standard of review promises more costs to stockholders in the form of litigation rents and inhibitions on risk-taking than it promises in terms of benefits to them.[229]

---

[228] *Corwin*, 125 A.3d at 313. *See also In re Massey Energy Co. Derivative & Class Action Litig.*, 2017 WL 1739201, at *19 (Del. Ch. May 4, 2017) (discussing the "fundamental policy underlying *Corwin*").

[229] *Corwin*, 125 A.3d at 313 (emphasis added).

Chancellor Bouchard recently cautioned, however, that the policy underlying *Corwin* "was never intended to serve as a massive eraser, exonerating corporate fiduciaries for any and all of their actions or inactions preceding their decision to undertake a transaction for which stockholder approval is obtained."[230]  In that regard and for the reasons explained below, despite the lack of a controller here I find that the Plaintiff has pled facts making it reasonably conceivable that the vote of the disinterested stockholders in this matter was structurally coerced. Accordingly, such a vote fails to cleanse the transactions here under *Corwin*.

Coercion is a context-driven term.  The term itself "is not very meaningful."[231] Its ordinary definition, "something akin to intentionally persuading someone to prefer one option over another," is different from saying such persuasion "would so impair the person's ability to choose as to be legally actionable."[232]

> For the word to have much meaning for purposes of legal analysis, it is necessary in each case that a normative judgment be attached to the concept ('inappropriately coercive' or 'wrongfully coercive', etc.). But, it is then readily seen that what is legally relevant is not the conclusory term 'coercion' itself *but rather the norm that leads to the adverb modifying it.*[233]

---

[230] *In re Massey*, 2017 WL 1739201, at *20.
[231] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986).
[232] *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 117 (Del. Ch. 2007) (internal citations omitted).
[233] *Katz*, 508 A.2d at 880 (emphasis added).

I have attempted to define structural coercion, in the ratification context, above. It does not necessarily implicate director wrongdoing in the structuring of a vote, and such structuring, in any event, is not the focus of liability here. In the *Corwin* context, a structurally-coerced vote is simply a vote structured so that considerations extraneous to the transaction likely influenced the stockholder-voters, so that I cannot determine that the vote represents a stockholder decision that the challenged transaction is in the corporate interest.[234] If I cannot make such a determination, no ratification has occurred, and any inherent breaches of duty regarding the transaction are uncleansed. In such a case, I must do a traditional analysis of the transaction regardless of the stockholder vote, and determine whether business judgment or entire fairness is the applicable standard of review.

This, I note, is not a license for plaintiffs to pick apart factors in stockholder votes to nullify ratification. If a transaction is negotiated and structured in a particular way, and presented to the stockholders such that they may ratify it, or reject it and retain the status quo, such a vote is not structurally coercive.[235] Breaches of duty inherent in that transaction—failure to run an informed sales process, say, or negotiation by self-interested fiduciaries—are not themselves separate

---

[234] *Williams v. Geier*, 671 A.2d 1368, 1382 (Del. 1996) (citing *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch. 1987)).
[235] *See In re Gen. Motors Class H Shareholders Litig.*, 734 A.2d 611, 621 (Del. Ch. 1999) (explaining that the voting stockholders "had a free choice between maintaining their current status and taking advantage of the new status offered by the [transactions]").

"transactions" imbedded in the vote that render it coercive. Likewise, the mere fact that a transaction is "economically too good to resist" is not enough to render an otherwise valid stockholder vote structurally coercive.[236] Rather, Courts will defer to a board's decision to structure a deal unless the decision "strong-arms" the stockholders into voting for the transaction "for reasons outside of the economic merit" of the decision.[237] Our case law, therefore, draws a distinction between potential breaches of duty inherent in the transaction, which are cleansed by a ratifying vote, and extrinsic "strong-arming."

The question here is whether the Director Defendants structured the transactions and votes in such a way that the Liberty Share Issuances and the Voting Proxy Agreement have been ratified. In order for a cleansing ratification to inhere in a stockholder vote, the board must have structured the vote in a way that gives stockholders the "free choice between maintaining their current status and taking advantage of the new status offered by" the transaction.[238] In other words, when examining whether a vote was structurally coerced, I must consider "whether the stockholders have been permitted to exercise their franchise free of undue external pressure created by the fiduciary that distracts them from the merits of the decision

---

[236] *Ivanhoe Partners v. Newmont Min. Corp.*, 533 A.2d 585, 605 (Del. Ch. 1987) (internal quotations omitted).

[237] *Gradient*, 930 A.2d at 119 (discussing *In re Gen. Motors*, 734 A.2d at 620–21).

[238] *In re Gen. Motors*, 734 A.2d at 621.

under consideration."[239] Ultimately, I may not find cleansing ratification if the facts pled indicate that the vote was not an informed stockholder approval *of the transaction at issue*, as itself in the interest of Charter.

Here, the Board presented the Charter stockholders with multiple proposals on which to vote. One proposal concerned the TWC Merger, which 90% of outstanding Charter shares voted to approve.[240] All parties here agree that that transaction, and the New Bright House Transaction, were value-enhancing to stockholders. Another proposal addressed the Liberty Share Issuances and the Voting Proxy Agreement, which 86% of stockholders unaffiliated with Liberty Broadband voted to approve.[241] Concerning both of these proposals, the Proxy disclosed to the Charter stockholders:

> In order to satisfy the conditions to the completion of the mergers, Charter and TWC stockholders must vote to approve the adoption of the merger agreement and Charter stockholders must vote to approve the stock issuances in connection with the transactions contemplated by the merger agreement, the Liberty investment agreement and the BHN/Liberty stockholders agreement, the Liberty transactions and the amended and restated certificate of incorporation, as described in this joint proxy statement/prospectus.
>
> In order to satisfy the conditions to the completion of the BHN transactions, Charter stockholders must vote to approve the stock issuances in connection with the transactions contemplated by the BHN/Liberty stockholders agreement and the BHN contribution

---

[239] *In re Saba*, 2017 WL 1201108, at *15 (citing *Williams*, 671 A.2d at 1382–83; *Gradient*, 930 A.2d at 117–121).
[240] *See* Yoch Aff. Ex. F.
[241] *See id.*

60

agreement, certain Liberty transactions (including the provisions of the BHN/Liberty stockholders agreement) and the amended and restated certificate of incorporation, as described in this joint proxy statement/prospectus.[242]

In other words, in order to receive the benefit that the Director Defendants had obtained by negotiating the Acquisitions, Charter stockholders had to vote for a transaction allegedly transferring wealth from Charter to Liberty Broadband, and approve an alleged concentration of voting power in Liberty Broadband. Charter stockholders could vote against these allegedly-inequitable transfers to Liberty Broadband, but they would have to give up the value the directors had achieved via the Acquisitions.

I assume, for purposes of this ratification analysis only, that fiduciary duty violations inhered in the Liberty Share Issuances and the Voting Proxy Agreement. The Board, in that case, presented the stockholders with a simple choice: accept (disloyal) equity issuances to the Company's largest stockholder, and an agreement granting that stockholder greater voting power, or lose two beneficial transactions. In other words, the stockholders were told that if they refused to approve certain transactions, themselves potentially not in the corporate interest, they would lose out on other, beneficial, transactions.

---

[242] Compl. ¶ 99; Proxy at 5. I note that the Voting Proxy Agreement and the $700 Million Share Issuance was contained in the "BHN/Liberty stockholders agreement" referenced by the Proxy here. *See* Proxy at 28–29. The $4.3 Billion Share Issuance was contained in the "Liberty investment agreement." *See* Proxy at 29.

Accordingly, the Charter stockholders, it seems to me, were not able to "*easily protect themselves at the ballot box by simply voting no.*"[243]  If they voted one way, they would forgo two lucrative deals.  If they voted another way, they would transfer value to an insider (and, should *Corwin* apply, release a potentially valuable fiduciary duty claim).

The Defendants rely on *In re General Motors Class H Shareholders Litigation*[244] for the proposition that a vote is only coercive "when stockholders are 'put to a choice between a new position and a compromised position,' not when they are given 'a free choice between maintaining their current status and taking advantage of the new status' offered by the transaction on which they are voting.'"[245] According to the Defendants, the stockholders had such a free choice here—accept or reject the aggregate transactions *in toto.*  In *General Motors*, the board of directors told stockholders that voting to approve the transactions in that case—essentially a recapitalization—would require that the stockholders waive certain charter provisions granting the stockholders certain rights in the event of a recapitalization.[246]  The stockholders were also told that a similar transaction in the future would be subject to more burdensome tax consequences because of recent

---

[243] *Corwin*, 125 A.3d at 313 (emphasis added).
[244] 734 A.2d 611 (Del. Ch. 1999).
[245] Charter Defs' Reply Br. 22–23 (quoting *In re Gen. Motors*, 734 A.2d at 621).
[246] *In re Gen. Motors*, 734 A.2d at 614–615.

legislation.[247]  Then-Vice Chancellor Strine held that structuring the vote in such a way was not coercive, because all that the stockholders "were asked to do [was] to accept a new status or remain in their current status," explaining that "[r]esponsible investors must be prepared to make such choices."[248]  The Court noted that the Plaintiffs' allegations did not state "a claim that the coercive actions were 'unrelated to the merits'" of the transactions at issue.[249]  The applicability of the *General Motors* rationale here depends on the latter consideration; were the Issuances (and the Voting Proxy Agreement) an integral part of the overarching Acquisition transactions, or do the pleadings make it reasonably conceivable that the Issuances and Voting Proxy Agreement were extrinsic, and tacked to the Acquisitions to strong-arm a favorable vote?  At the pleading stage, I find the latter.

It is a truism that every deal involves a compromise of sorts.  Thus, a party to a deal always gives something up; it must always weigh the costs and benefits of the proposed transaction.  If a deal is completed, it is because each party has decided that, on net, the deal is subjectively beneficial.  The recapitalization in *General Motors* was just such a deal:  the stockholders forwent certain economic rights in order to obtain a greater economic benefit.  The stockholders here, however, did not simply offer up some economic right belonging to them in order to obtain the net

---

[247] *Id.* at 620.

[248] *Id.* at 621.

[249] *Gradient*, 930 A.2d at 118 (quoting *In re Gen. Motors*, 734 A.2d at 620).

63

benefit of the TWC Merger and the New Bright House Transaction. Rather, the Charter stockholders were confronted with accepting an allegedly tainted transaction in order to obtain two larger beneficial transactions. Because I find it reasonably conceivable that the vote on the challenged transactions was "unrelated to the merits" of the Acquisitions, but structured in such a way make receipt of the benefits of the Acquisitions contingent of that vote, the rationale of *General Motors* in inapplicable here.

In the classic *Corwin* case, fiduciaries ask stockholders via their votes to ratify an intrinsic element of the deal process, such as the alleged lack of independence of a majority of the directors. There, courts generally will defer to the stockholder franchise on process matters inherent in a deal that stockholders deem valuable. The Defendants refer to the Issuances as "financing" for the Acquisitions, but in reality, the equity sale to Liberty Broadband formed an insignificant part of the consideration for the Acquisitions. Is such financing an inherent part of the transaction? I find the pleadings sufficient to make it reasonably conceivable that the insider financing was not integral to, but was extrinsic to, the Acquisitions.[250]

The Plaintiff alleges that Charter "easily could have proceeded with either just the TWC Transaction or with the TWC Transaction and a transaction to acquire

[250] *See* Compl. ¶ 77.

64

Bright House without improperly benefiting Liberty Broadband."[251] To that point, I note that the record does not disclose that the Defendant Directors made a determination that the Issuances and the Voting Proxy Agreement were necessary to the Acquisitions. I also find nothing in the Proxy informing stockholders that this financing was in the corporate interest, *independent of the Acquisitions*. In fact, the fairness opinions offered to the Board and the stockholders failed to address the fairness of the Liberty Share Issuances (and the Voting Proxy Agreement), standing alone.[252] The Defendants also point to nothing in the pleadings and documents incorporated therein that indicates that the Director Defendants attempted to obtain the small part of the deal financing provided by Liberty Broadband, by instead issuing equity to a non-insider.[253] Rather, the Proxy discloses that *Liberty Broadband* initially proposed the Liberty Share Issuances and from then on, it seems to me, implies that the Issuances were a "done deal," more-or-less.[254] More specifically, for the $4.3 Billion Share Issuance, the Proxy states "Mr. Maffei [of Liberty Broadband] also noted *Liberty Broadband's interest* in making a significant

---

[251] *Id.*

[252] *See id.* at ¶¶ 126, 127 n.8, 129, 131; Proxy at 196, H-5, J-4.

[253] To the extent I am improperly characterizing the $700 Million Share Issuance as financing for the New Bright House Transaction, any other plausible beneficial purpose *to Charter stockholders* for its execution eludes me.

[254] *See* Proxy at 139 ("Liberty Broadband proposed to commit at the [Bright House] signing . . . not less than $650 million of Charter Class A Common Stock."); *id.* at 143 (stating with regards to the TWC Merger that "Mr. Maffei [of Liberty Broadband] also noted Liberty Broadband's interest in making a significant additional investment in Charter.").

additional investment in Charter . . . in light of Charter's potential financing needs and *Liberty Broadband's desire* to maintain its percentage equity interest in Charter."[255] Then, without further explanation, discussion of the TWC Merger in the Proxy appears to continue under the assumption that the TWC Merger would be financed (in small part) by an additional equity investment by Liberty Broadband.[256]

Moreover, the Defendants cite to nothing in the pleadings and incorporated documents that indicates the Liberty Share Issuances were the only method of financing available for the approximately $5 billion obtained through their execution. To the contrary, the Proxy briefly mentions the Board's exploration of debt financing, that Charter "expect[ed] to finance part of the consideration for the [Acquisitions] with additional indebtedness of approximately $24 billion" and that Charter had "committed financing for approximately $4.3 billion of additional indebtedness."[257] In other words, in a deal that valued TWC at $78.7 billion and involved stock consideration of approximately $29.3 billion, cash consideration of approximately $27.5 billion, and Charter taking on additional indebtedness of $24

---

[255] *Id.* at 143 (emphasis added).

[256] *See* Compl. ¶ 108 ("Without any further discussion, Charter executives appear to have assumed that the TWC Transaction would be financed, in part, by a further share purchase by Liberty Broadband."). The Proxy only pauses later to note that members of Charter management had a call with Liberty Broadband management "to discuss the potential terms on which Liberty Broadband was interested in making an additional investment in Charter to partially finance the cash portion of the consideration to be paid to the TWC stockholders." *See* Proxy at 147.

[257] *See* Proxy at 143, 222.

billion to finance part of that consideration,[258] the Proxy does not disclose to the stockholders the reason the relatively insignificant $4.3 billion in financing from the Liberty Share Issuance was an integral part of the transaction. At this pleading stage, I remain unconvinced that this particular form of financing via an equity issuance to the Company's largest stockholder was necessary to, or inherently a part of, the overall deal.[259]

Accordingly, one reasonable inference from the facts pled in the Complaint (although not the only one) is that the Defendants obtained the Acquisitions, and then used the value of those transactions to obtain a favorable vote on extrinsic transactions—the Liberty Share Issuances and the Voting Proxy Agreement, transactions that allegedly transferred wealth and voting power to Liberty Broadband at stockholder expense. If so, this was structurally coercive, and no ratifying cleansing resulted therefrom. I cannot find from the vote itself that the independent

---

[258] Compl. ¶ 75; Proxy at Cover Letter to Stockholders. I note that the expected aggregate equity value of the TWC Merger to the TWC stockholders was approximately $57.5 billion, assuming TWC stockholders took the $100 cash option. *See* Proxy at Cover Letter to Stockholders.

[259] I also note that it appears from the Proxy that the TWC Merger was not subject to any "financing out" condition. *See* Proxy at 160 (listing "the absence of financing conditions or other limitations on recourse if Charter is unable to obtain financing from its debt financing sources or if the Liberty transactions are not consummated" as a "countervailing factor" considered by the Board in its deliberations on the TWC Merger.) If so, I find it curious that the Director Defendants conditioned the stockholders' receipt of the TWC Merger on the stockholders' approval of the approximately $5 billion in financing from the Liberty Share Issuances, but failed to negotiate for a financing condition in the actual merger agreement itself.

stockholders made a determination that the Issuances and Voting Proxy were in the interests of Charter.

Before turning from this analysis, it is appropriate to note that all I have determined here is that the vote in favor of the Issuances and Voting Proxy does *not* cleanse breaches of duty, *if any*, inherent in those transactions; and not that the Complaint has stated a claim that such wrongdoing in fact exists. I now turn to that analysis.

*B. The Nature of the Claims*

Having found that, on the current pleadings, the Defendants are not entitled to a dismissal under the *Corwin* doctrine, I must turn to the substance of the Motions to Dismiss. The Plaintiff brings his claims, allegedly, both for himself and derivatively on behalf of Charter. The Defendants moved to dismiss these claims under Court of Chancery Rules 12(b)(6) and 23.1. Perhaps because of the parties' focus on dismissal under *MFW* and *Corwin*, they gave scant attention in briefing as to whether the claims here are in fact direct or derivative.[260] Such a determination will have a substantial effect here, of course. If the claims are direct, the Plaintiff must plead only facts that disclose a reasonable conceivability of liability in order to surmount the Motion to Dismiss; he faces the steeper climb to show that the Board

---

[260] *See generally El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) (explaining direct, derivative, and "dual-natured" claims).

could not bring its business judgment to bear on the demand he forwent, before he may proceed derivatively consonant with Rule 23.1. I consider the briefing insufficient for me to proceed efficiently on an analysis of the nature of the Plaintiff's claims. Therefore, I reserve decision on the Motions to Dismiss. The parties should confer and provide a stipulated supplemental briefing schedule on this issue.

## III. CONCLUSION

For the reasons stated above, I reserve on the Defendants' Motions to Dismiss, pending supplemental briefing.